In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-2908

DODIE JUNKERT,

*Plaintiff-Appellant,*

*v.*

ROGER W. MASSEY,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 06 C 3243—**Richard Mills**, *Judge.*

ARGUED FEBRUARY 8, 2010—DECIDED JUNE 21, 2010

Before BAUER, EVANS, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Dodie Junkert practices law in
Clinton, the county seat of Dewitt County, Illinois. In
January 2003, both her law office and residence were
searched by local law enforcement officers who hoped
to find stolen laptop computers and controlled sub-
stances there. Junkert contends that the searches
violated her Fourth Amendment right to be free from
unreasonable searches, and brought this suit pursuant

to 42 U.S.C. § 1983 to vindicate that claim. A jury evaluated her claim and rejected it. Ms. Junkert contends in this appeal that she was entitled to judgment as a matter of law that the searches were unconstitutional so that the jury should have been instructed to consider only the amount of the damages to be awarded.

In 2002 and 2003, police were investigating a series of some 40 burglaries across several central Illinois communities, including Clinton, involving the theft of items that included laptop computers and firearms, including police shotguns. Roger Massey, the Sheriff of DeWitt County, was a lead player in the investigation, known as "Operation Ringbuster."

Ringbuster investigators obtained evidence linking Jeffrey McCall to several burglaries involving the theft of laptops. The DeWitt County Sheriff's office gathered additional information on McCall by interviewing one of his cohorts, Richard Baker, who admitted to receiving stolen shotguns from McCall. Baker also told Massey that he dealt drugs with McCall, at which point Massey arranged for Baker to be interviewed by Sergeant Jered Shofner, an Illinois State Police officer focused on narcotics cases. Shofner already suspected McCall and Baker of drug crimes, as he had received information that McCall was a heavy cocaine user who had stolen property to pay off Baker, his dealer.

In a January 20, 2003, interview with Shofner, Baker provided information on the drug activities of various persons, including McCall. Shofner corroborated much of Baker's information by reviewing police surveillance

of Baker with another cocaine distributor and verifying the name and address of the person Baker claimed was his cocaine source. Shofner also followed up on Baker's claim that he received guns from McCall as payment on a cocaine debt. Shofner drove Baker to a junkyard where Baker said the guns were located, and Baker recovered the guns.

Baker then gave Shofner the pieces of information that are most central to this appeal: statements linking McCall's criminal activity to attorney Junkert. According to Baker, sometime in late 2002, McCall said that he owed his attorney, who was female, $1500 for legal services and gave her two stolen laptops as partial payment. McCall told Baker that the attorney knew that the laptops were stolen and asked McCall to get her two more. McCall also revealed to Baker that his attorney was a cocaine user.

Massey checked local court records to find that, on December 10, 2002, McCall retained Junkert—the only female attorney practicing in DeWitt County—as privately employed counsel to represent him in connection with the burglary case. At that point, Massey and Shofner prepared an affidavit for a warrant to search two locations occupied by Junkert for laptop computers and controlled substances. The first location was Junkert's law office, described in the warrant application as "the entire premises located at 216 S. Grant Street, Clinton IL, being a grey two story building with white trim with a sign in the front yard that reads 'Dodie Junkert Attorney at Law.'" The second location was Junkert's residence,

but that fact was not apparent from the face of the affidavit, which described the location simply as "a yellow one story ranch with attached garage" located at "1305 S. Madison St., Clinton IL," without identifying that address as Junkert's home.

As the basis for probable cause, the warrant affidavit cited the information provided by Baker, except Baker was not identified by name. The affidavit referred to Baker simply as a "Confidential Source" ("C/S") who had supplied Shofner with reliable information in the police's ongoing laptop-burglary investigation. The affidavit claimed that the C/S provided specific locations of stolen property, as well as information on numerous drug dealers.

The affidavit did not assert that the C/S or anyone else actually saw stolen laptops or drugs in Junkert's home or office. Instead, the affidavit relayed the C/S's statement to Shofner that McCall said that he gave his female attorney two stolen laptops as payment on a $1500 debt, and that the attorney wanted two more laptops. The affidavit then explained that court records showed that McCall had retained Junkert in connection with the burglary case, after a prior, unsuccessful attempt to obtain private counsel, despite McCall's lack of employment.

The affidavit also cited the C/S's statement that McCall said that his attorney was a cocaine user, and reported that Illinois State Police officers knew that McCall distributed cocaine in the Clinton area. The affidavit's sole attempt to link the items to be seized to any

particular location was the final, seemingly boilerplate paragraph, which asserted that Massey was "aware from his training and experience in these types of investigations that illegal controlled substances and stolen property can be typically hidden throughout various locations of said residences. . . ."

On January 22, 2003, Massey signed the warrant affidavit and presented it to an Illinois Circuit Court judge, who issued the warrant for Junkert's home and office the same day. Before executing the warrant, Massey called Junkert, who was then in St. Louis, to obtain her presence at the search so that the police would not have to force entry into her home. At that point, Junkert admitted to Massey that she received two laptop computers from McCall and, upon returning to Clinton, handed over the one computer that she still had in her possession. Junkert also told Massey where the second computer was located, allowing the police to recover it also before the search. (At earlier stages in the district court, Junkert asserted that if probable cause ever existed, it dissipated upon recovery of the second laptop. She does not pursue that theory on appeal.)

Massey and other officers then executed the search warrant on Junkert's home and law office. Beginning at Junkert's office, police seized an empty manila folder with the name "Jeff McCall" on it. Moving on to Junkert's home, the police searched every room in the house but did not find any laptop computers. The police did seize a mirror, several straws, and pieces of aluminum foil that contained trace amounts of cocaine.

Junkert was charged in state court with crimes relating to the laptop computers and drug evidence recovered by the police. After a trial resulted in a hung jury, the prosecution agreed to dismiss the charges in exchange for Junkert's placing her law license on inactive status for four months.

Junkert then brought this action under 42 U.S.C. § 1983 against Massey in his individual capacity. Her complaint raised several Fourth Amendment claims, including that the search of her home and office was invalid because Massey's warrant lacked probable cause. The case went to trial before a jury, who returned a verdict in favor of Massey. Junkert renewed her pre-verdict motion for judgment as a matter of law, arguing that the search warrant was so deficient that Massey could not have reasonably believed that it established probable cause. The district court denied Junkert's motion, and Junkert appeals.

We review de novo the district court's denial of a motion for judgment as a matter of law, viewing the evidence in the light most favorable to the jury's verdict. *Waters v. City of Chicago*, 580 F.3d 575, 580 (7th Cir. 2009). We also review de novo whether a warrant was supported by probable cause, but we afford great deference to the decision of the judge issuing the warrant. *United States v. Bell*, 585 F.3d 1045, 1049 (7th Cir. 2009). We will uphold a finding of probable cause as long as the issuing judge had a " 'substantial basis' " for concluding " 'that a search would uncover evidence of wrongdoing.' " *United States v. Dismuke*, 593 F.3d 582, 586 (7th Cir. 2010) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)).

"[A]n affidavit submitted in support of a search-warrant application will be sufficient to support a proba-ble-cause finding if, 'based on the totality of the circum-stances, the affidavit sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime.'" *Id.* (quoting *United States v. Peck*, 317 F.3d 754, 756 (7th Cir. 2003)). Where, as here, the affidavit relies on information supplied by an informant, "the totality-of-the-circum-stances inquiry generally focuses on the informant's reliability, veracity, and basis of knowledge." *Id.* (citing *United States v. Olson*, 408 F.3d 366, 370 (7th Cir. 2005)). Several factors inform the analysis, including: (1) the degree of police corroboration of the informant's infor-mation; (2) whether the information is based on the infor-mant's personal observations; (3) the amount of detail provided by the informant; (4) the interval of time between the events reported by the informant and the warrant application; and (5) whether the informant personally appeared before the warrant-issuing judge. *Id.* at 587 (citing *United States v. Koerth*, 312 F.3d 862, 866 (7th Cir. 2002)).

Examined against these factors of informant reliability, the C/S's information leaves much to be desired. The C/S did not state that he personally observed laptops or drugs in Junkert's home or office, or even that McCall claimed to have such firsthand observation. *Cf. id.* (infor-mant told police that he personally and recently saw guns in the defendant's home). The C/S also failed to specify the time periods or other details of Junkert's criminal activity. Although the C/S claimed that McCall

said that he gave stolen laptops to Junkert and that Junkert was a cocaine user, the affidavit provided no information on the time or place of any particular crime. *Cf. id.* at 585, 587 (informant saw guns in the defendant's home within a week of the warrant application); *United States v. Woolsey*, 535 F.3d 540, 542 (7th Cir. 2008) (informant saw over two pounds of drugs at specific places in the defendant's home in the past week). The C/S also did not personally appear before the Illinois state judge issuing the warrant.

The affidavit did attempt to bolster the C/S's reliability by stating that he had provided accurate information on previous drug and property crimes. Still, while this information might go to the C/S's past reliability on other crimes not involving Junkert, it supplies no details to support the C/S's generalized assertions that Junkert was engaged in criminal activity. *See Peck*, 317 F.3d at 757 (police check on the defendant's record was insufficient to corroborate an informant's non-detailed allegations of drugs in the defendant's home).

The affidavit also described the police's investigation linking McCall to the possession of stolen laptops and drugs, showing that McCall was at least capable of giving these items to Junkert. The affidavit further stated that the police confirmed that an unemployed McCall retained Junkert as private counsel (although he previously was appointed a public defender), suggesting that she would be expecting a fee from McCall (though not necessarily in the form of stolen computers). Even so, in the absence of any details about a particular criminal trans-

action between McCall and Junkert, the police's background information on McCall's crimes and retention of Junkert has only modest corroborative value. *See Dismuke*, 593 F.3d at 588 (confirmation of the defendant's identity and address "d[id] not directly bolster the informant's claim that Dismuke illegally possessed guns at his home").

Of course, we cannot focus too heavily on any one of these deficiencies in the affidavit, which must be read as a whole in light of the totality of the circumstances. *See Bell*, 585 F.3d at 1051 ("[T]he whole may be more than the sum of the parts when assessing probable cause." (quotation omitted)). Nevertheless, the sum of the C/S's information essentially says that McCall, a known thief and cocaine dealer, claimed that he paid off his lawyer, also a cocaine user, with stolen laptop computers at some unspecified time and place. Even remaining mindful of the great deference afforded to the issuing judge's decision, it is difficult to conclude that these generalized assertions of Junkert's wrongdoing provided a "substantial basis" to search her home or office.

Assuming that the search warrant lacked probable cause, it does not necessarily follow that Massey may be personally liable in Junkert's § 1983 action. Massey is entitled to qualified immunity for his conduct in applying for a search warrant. *See Hinnen v. Kelly*, 992 F.2d 140, 144 (7th Cir. 1993). In this context, the test for qualified immunity comes from *Malley v. Briggs*, 475 U.S. 335, 344-45 (1986), in which the Supreme Court held that an officer who relies on a subsequently invalidated warrant may be liable for § 1983 damages only if the

warrant application was "so lacking in indicia of probable cause as to render official belief in its existence unreasonable." In *Malley*, the Court adopted this qualified immunity standard from the standard established in *United States v. Leon*, 468 U.S. 897 (1984), for the good-faith exception to the exclusionary rule. *Malley*, 475 U.S. at 344. So the evaluation of qualified immunity in obtaining a search warrant is similar to that used in applying the good-faith standard (in fact, there may be no difference at all in the analysis). *See Koerth*, 312 F.3d at 869. An officer may be personally liable only if "(1) courts have clearly held that a materially similar affidavit previously failed to establish probable cause under facts that were indistinguishable from those presented in the case at hand; or (2) the affidavit is so plainly deficient that any reasonably well-trained officer 'would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant.'" *Id.* (quoting *Malley*, 475 U.S. at 345).

We have never clearly held that an affidavit materially similar to Massey's failed to establish probable cause. We also cannot say that the affidavit was so deficient on its face that Massey's reliance on it was unreasonable. Although not a model for probable cause, the affidavit does contain some information supporting the inference that Junkert possessed evidence of a crime. As discussed, the affidavit described McCall's past burglaries (including crime scene evidence and the recovery of stolen items linking McCall to at least one burglary in which four laptops were taken on December 5, 2002) and drug dealings followed by his retention of Junkert as

private counsel, making it plausible that McCall would convey stolen laptops or drugs to Junkert. Through court records described in the affidavit, it was established that in September 2002, McCall was appointed a public defender after he was unsuccessful in obtaining private counsel, but that suddenly, on December 10, 2002, McCall was able to obtain Junkert as his private counsel. The affidavit notes McCall's ability to move from public to private counsel despite the police records showing him to be unemployed. The affidavit also reported that the C/S had provided accurate, specific information on other drug and property crimes similar to Junkert's suspected criminal activity. This attempt to demonstrate the C/S's track record distinguishes Massey's affidavit from one offering a "wholly conclusory" statement of informant reliability. *Dismuke*, 593 F.3d at 587; *see also United States v. Mitten*, 592 F.3d 767, 774 (7th Cir. 2010) ("Past performance is one way of establishing the veracity or reliability of an informant . . . ."); *Koerth*, 312 F.3d at 867 ("[T]he affidavit fails to explain the extent, if any, that [the informant] has previously provided information leading to arrests or prosecutions for criminal activity of any kind.").

Finally, in an attempt to link stolen computers and drugs to Junkert's home, the affidavit cited Massey's "training and experience" that "illegal controlled substances and stolen property can be typically hidden throughout various locations of said residences." This statement partially ameliorates the C/S's lack of first-hand observation of the places to be searched, since a judge may rely on an officer's experience to draw "rea-

sonable inferences about where evidence is likely to be kept." *United States v. Orozco*, 576 F.3d 745, 749 (7th Cir. 2009) (quoting *United States v. Lamon*, 930 F.2d 1183, 1189 (7th Cir. 1991)).

Admittedly, the affidavit's reference to "said residences" is ambiguous, since the affidavit contained no previous mention of any "residence." Indeed, the warrant application never explicitly stated that Junkert's residence was one of the two locations to be searched; the reader of the warrant must infer that the "yellow one story ranch with attached garage" at the listed address is Junkert's home. (Although not part of our consideration of qualified immunity, a minor fact that came out at trial may explain the omission of an identification of the yellow house as Junkert's residence. Apparently, the affidavit was prepared for presentation to a Dewitt County judge, who, in a city with a population of less than 8,000 and a correspondingly small bar, might be expected to recognize that location as Junkert's residence. However, both Dewitt County judges recused themselves from reviewing the warrant because of the potential involvement of a local attorney as a subject of the search. The affidavit was ultimately presented to a judge in adjacent Piatt County.) The affidavit also lacked details about why Junkert, more than any other suspect, would be uniquely likely to keep evidence in her home. *Cf. id.* at 748-49 (citing the officer's experience that a high-ranking member of a drug distribution gang would probably keep evidence in his home); *Lamon*, 930 F.2d at 1186, 1189 (officer's experience that major drug dealers often keep drugs and records at a permanent residence

that is not a drug distribution site). So Massey's general experience with other suspects hiding evidence in their residences, without more, does not show a fair probability that Junkert kept stolen laptops or drugs in her home. Still, the affidavit's mention of Massey's experience provides another reason why an officer could reasonably believe that the warrant was supported by probable cause.

Although the few indicia of reliability highlighted above leave the affidavit with much to be desired, we conclude that an officer could reasonably believe that the affidavit established probable cause. With Junkert's assistance in this retrospective critique, we have found holes in the affidavit which raise doubts about whether it provided the judge with probable cause to issue the search warrant. But the affidavit does contain several indicia of probable cause, and it is not so deficient that any reasonably well-trained officer would have known that probable cause was lacking, requiring the second-guessing of the judge's authorization. Massey therefore has a qualified immunity defense against Junkert's § 1983 action, and for that reason, we find no reason to overturn the judgment in favor of Massey.

We close with this additional cautionary note, though. When Junkert initially filed her complaint in the district court, one of her claims was that Sheriff Massey directed the search in her office in a manner that did not respect the confidentiality of attorney-client communications and attorney work product. Somewhere along the line, that claim dropped out of the case and so is not before

us. But this serves a good reminder: law enforcement officials should be cautious when permitted to search places where information protected by recognized privileges may be stored, such as the offices of lawyers or medical practitioners, so as not to invade those privileges in an unauthorized manner. It is equally as important that when a magistrate is asked to issue a warrant authorizing the search of such a place, the judicial authority should be even more cautious, if possible, to make sure that any warrant issued is carefully drawn, so as not to allow the police to blithely rummage through privileged information unrelated to the subject of the search.

AFFIRMED.